IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NUMBER: 04-81200-CIV-HURLEY
MAGISTRATE HOPKINS

F.W.F. Inc. a foreign Corporation, and
Gerald Abrams,

                Plaintiffs

v.

Detroit Diesel Corporation, a Delaware
corporation, and Johnson and Towers,
Delaware, Inc. a Delaware corporation

       Defendants.
_____/

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      COME NOW Plaintiffs, F.W.F. Inc. and Gerald Abrams, (herein after collectively referred to as "Plaintiffs"), by and through their undersigned counsel, and file their proposed Findings of Fact and Conclusions of Law relating to the evidentiary hearing on their Motion to Enforce Settlement Agreement. The transcript of the evidentiary hearing of December 21, 2006 is designated as T1 and the transcript of the evidentiary hearing of January 24, 2007 is designated as T2.

## REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION TO ENFORCE

## SETTLEMENT AGREEMENT

      **THIS CAUSE** comes before this Court upon an Order of reference from the Honorable Daniel T. K. Hurley.  An evidentiary hearing was conducted by this Court on December 21, 2006 and on January 24, 2007.  Having heard the testimony of the

witnesses, reviewed the evidence and pleadings and having head the arguments of counsel, this Court recommends as follows:

## Background

This litigation arises from a Complaint filed in Admiralty by Plaintiffs against Defendant Detroit Diesel Corporation alleging, *inter alia*, breach of warranty and unfair and deceptive trade practices. In 2001, Gerald Abrams purchased a new 65-foot Viking motor yacht equipped with 1800 horsepower Detroit Diesel engines.   Detroit Diesel specified and guaranteed that the engines would produce 1800 horsepower at 2300 engine revolutions per minute (rpm).   Prior to delivery, sea trials established that the port engine did not develop full power. Abrams annotated the delivery documents to reflect that he was not accepting the port engine as satisfactory.   Over the next several years, Mr. Abrams repeatedly demanded that Detroit Diesel correct the power problem with the port engine under the warranty.   Detroit Diesel consistently took the position that there was nothing wrong with the port engine, that the problem was with the vessel's propellers, offering on at least two occasions to provide Abrams with custom propellers as a solution to the problem at the expense of Detroit Diesel.  Gerald Abrams also attended a meeting with representatives of Detroit Diesel, Scott Woodruff and Barney Bentgen, in Detroit during which replacement of his 1800 horsepower engines with 2000 horsepower engines, including the potential need to modify the vessels' exhaust system to accommodate the larger engines, was discussed. Ultimately, Plaintiffs brought suit against Detroit Diesel seeking replacement of both the port engine and the starboard engine, alleging that the problems with the port engine had caused

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

excessive wear and tear on the starboard engine as manifested by multiple breakdowns of that engine.

After several technical tests by Detroit Diesel to demonstrate that the port engine could produce the specified horsepower ended in failure, Plaintiffs and Detroit Diesel negotiated a hand written, Memorandum of Settlement at Court-ordered mediation on November 18, 2005.  Subsequently, shortly after the settlement, further testing by Detroit Diesel confirmed that Gerald Abrams had been correct.  Detroit Diesel discovered that the port engine could not perform due to a possible manufacturing defect that prevented it from developing the specified horsepower.  Additionally, Detroit Diesel discovered that there was additional engineering work and costs to install the 2000 hp engines with proper exhausts and ZF gears and proper propellers on the boat.  Thereafter, the Detroit Diesel's cooperation in the implementation of the Memorandum of Settlement became increasingly strained.

Plaintiffs allege that Detroit Diesel, upon learning of the additional costs of replacement and having discovered the cause of and the solution to the power deficiency problem in the port engine, had second thoughts about the cost of the settlement they had agreed with Plaintiffs and decided to attempt to unravel the settlement in the hope of being able to achieve a more favorable outcome or force Plaintiffs to pay for work on the LADY JANE.  Detroit Diesel argues that it was recalcitrance and unreasonableness on the part of Mr. Abrams that caused the implementation of the settlement agreement to founder.

At mediation, the Parties executed a hand written Memorandum of Settlement setting forth their agreement.  Although the scrivener of the agreement was one of

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

Plaintiffs' attorneys, the evidence established that all the Parties participated in the drafting of the agreement and agreed to its terms.  It was anticipated and agreed by the Parties at mediation that the Parties would later execute in good faith a mutually agreeable, type written Settlement Agreement incorporating the terms and conditions of the hand written agreement, which would include a reasonable confidentiality agreement and the terms and conditions of mutual releases. After exchanging several drafts of the more formal agreement, further negotiations broke down and the Parties were never able to execute another settlement agreement to supersede the current valid agreement.

The initial dispute between Plaintiffs and Detroit Diesel revolved around the scope of the undertaking by Detroit Diesel when Detroit Diesel agreed to bear all costs of removing the old 1800 horsepower engines and installing the new 2000 horsepower engines and making the vessel whole.  Execution of the more formal settlement agreement broke down in April of 2006 when Detroit Diesel took the new position that Abrams would now have to pay for the cost of any modifications to the engines, exhaust system, or propellers necessitated by the installation of the larger engines, a cost of approximately $75-100,000.  Gerald Abrams did not agree to pay such an expense, arguing that Detroit Diesel knew at the time of settlement that such modifications would be necessary to complete the installation of the engines and successfully complete a sea trial.  Even armed with this prior knowledge, Detroit Diesel failed to include any language in the Memorandum of Settlement requiring Plaintiffs to pay for **any** aspect of the installation whatsoever, and failed to place any limit on their financial obligation with regard to paying for the cost of the installation.

4

The Parties next fell into dispute over the payment of attorneys' fees and costs and expert technical fees and costs by Detroit Diesel as set forth in the Memorandum of Agreement.  Plaintiffs sought payment from Detroit Diesel of attorneys' fees and costs and expert technical fees and costs totaling $205,521.39, including $4,080.00 for the services of a technical expert paid directly by Plaintiffs' attorneys and $13,317.00 for expert technical services provided by Plaintiffs' attorneys' in-house technical expert. Detroit Diesel took no action to pay **any** amount for attorneys' fees and costs or expert technical fees and costs within the 60-day time period enumerated in the Settlement Agreement and failed to object to any amount until notices of breach were tendered.

Efforts to arrive at a written agreement with regard to the shipyard to do the engine replacement work and the scope of work to be performed by the shipyard in relation to the engine work, as well as a formal guarantee of payment by Detroit Diesel to the shipyard also were not completed in spite of due diligence on the part of plaintiffs to secure this agreement.  Subsequently, Detroit Diesel advised Gerald Abrams that the ZF gears originally anticipated to be supplied with the 2000 horsepower engines could not be used in his vessel and that another gear, manufactured by Twin Disc, would be installed in his vessel.  Efforts by Plaintiffs to obtain technical information establishing whether the Twin Disc gear was an adequate and proper substitute for the ZF gear were also frustrated by defendant.  Gerald Abrams then took the position that because the Twin Disc gear is not rated for 2000 horsepower engines, that they are an inadequate substitute for the ZF gears and that they will reduce the market value of his vessel.

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

Ultimately, Plaintiffs filed this Motion to Enforce Settlement alleging that Detroit Diesel has failed to act in good faith and has breached several material terms of the hand written Memorandum of Settlement.  Specifically, Abrams alleges Detroit Diesel has: (1) failed to timely reimburse, as promised, Abrams for the attorneys' fees and expert technical costs incurred in the litigation; (2) failed to acknowledge that their agreement to pay all the costs for installing the new, larger engines in his vessel included an obligation to pay the cost of modifying the exhaust and/or propellers as necessary to properly operate with the larger engines; (3) failed to act with due diligence and reasonable promptitude to order the engines, provide a written agreement and scope of work and take the other reasonable actions required to affect the engine installation so as to allow the work to proceed on the agreed date of August 1, 2006; (4) having failed to complete a proper engineering analysis of the installation of the larger engines in the vessels, including a determination of the proper exhaust system, propellers, engine installation and reduction gears, unilaterally decided to install Twin Disc gears with the new engines which may not be adequate or suitable for use with the 2000 horsepower engines.

Plaintiffs seek an order from this Court to enforce the Memorandum of Settlement, specific performance, damages, interest, costs and attorneys' fees.

The Parties, having failed to negotiate and execute a more formal settlement agreement, both Parties have agreed to be bound by the hand written agreement.

## FINDINGS OF FACT

The Court makes the following findings of fact:

1.     F.W.F. Inc. is the owner of a 65-foot Viking motor vessel named LADY JANE.  Gerald Abrams is the beneficial owner of LADY JANE.

2.     LADY JANE was purchased from HMY Yachts in June 2001. Gerald Abrams paid an additional purchase price for an engine upgrade to Detroit Diesel 1800 horsepower engines. Detroit Diesel warranted, specified and guaranteed that the engines would develop 1800 horsepower at 2300 engines revolutions per minute.

3.     At the time of delivery, in July 2001, Gerald Abrams ascertained that the port engine was unable to generate the specified horsepower and torque as warranted, annotated the delivery paperwork to that effect and rejected the engine as unsatisfactory.

4.     Over the next several years, the efforts of Plaintiffs to allow defendant to cure or correct the power problem with the port engine continued. Detroit Diesel had to re-build the port engine on five separate occasions.  Detroit Diesel did not acknowledge any defect in the port engine and took the position that the inability of the engine to develop full power was caused by propellers that were not properly matched to the engines and offered to pay for propeller modifications. Abrams flew to Detroit in 2004 to meet with Detroit Diesel representatives who offered to address the problem with the port engines by paying for custom propellers, a proposal rejected by Mr. Abrams.  At that meeting, there was also a discussion of the possibility of replacing Mr. Abrams' 1800 horsepower engines with 2000 horsepower engines and the potential need to enlarge the exhaust system if that was done. (HOWE, T1, p57, L 14 to p62,L19; WOODRUFF, T1p145,L21 to p147, L 25; ABRAMS, T2p9, L 6 to p10, L 25, T2p12,L23 to p14,L23) )

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

5.      In August 2004, Abrams sued Detroit Diesel for breach of contract, breach of warranty and deceptive trade practices. The matter was set for trial in December 2005.

6.      The parties met at a mediation conference on November 18, 2005.

7.      The parties present at the mediation on behalf of Mr. Gerald Abram and F.W.F. Inc. were attorneys Andrew W. Anderson and Matthew J. Valcourt, and Gerald Abrams representing himself and F.W.F. Inc.

8.      Attendance at the mediation on behalf of Detroit Diesel was Counsel Scott Sarason and Christina McGinley, Ulrich Kemnitz, Scott Woodruff, and Brian Howe and in-house counsel for Detroit Diesel/MTU.  Brian Howe, Ulrich Kemnitz, Scott Woodruff are all engineers.

9.      After hours of negotiation, the parties came to an agreement which was memorialized in a handwritten Memorandum of Settlement.   The hand written agreement was **jointly drafted** by and was the joint product of the parties and their counsel in attendance and signed by all parties.  (WOODRUFF, T1, p152, LL 8-13; ABRAMS, T2p20,LL 11-22)

10.     In the first paragraph of the hand written Memorandum of Settlement Detroit Diesel agreed to "...install 2 new factory-built 2000HP 16V2000 including: A) All new gears and accessories for engines, B) All **costs for install including all accessories**." (Emphasis supplied)

11.     With regard to payment of fees and costs, the Memorandum of Settlement provided:

> Detroit Diesel to pay up to and including $150,000 in attorneys' fees and costs. Invoices to be provided within 60 days from November 18, 2005.

8

Houck Anderson, attorneys at law
200 South Biscayne Boulevard, Suite 300, Miami, Florida 33131-2332
Tel (305) 372-9044   Fax (305) 372-5044   www.houckanderson.com

Detroit Diesel to pay up to and including $60,000 of **expert technical fees and costs**. Invoices to be provided within 60 days from November 18, 2005. (Emphasis supplied)

Payment of attorneys' fees, costs and expert fees and costs to be made within 60 days of receipt of invoices.

12.     The Memorandum of Settlement also provided, in pertinent part, that:

Installation of engines and gears and removal of engines and gears to be performed at a mutual agreeable shipyard(s) by the parties **in writing**. (Emphasis supplied)

Detroit Diesel to grant a 5 year warranty to Plaintiffs commencing after installation and a successful sea trial of vessel engines.

13.      Nowhere is the Memorandum of Settlement is there any provision for Gerald Abrams or FWF Inc. to  pay for any aspect of the removal and installation of the engines.

14.     Similarly, although Detroit Diesel placed a cap on what it was willing to pay for attorneys' fess and costs and expert technical fees and costs, Detroit Diesel placed no limit on the scope of work or amount of money Detroit Diesel was willing to pay for removal of the old engines and installation of the new engines.

15.     Plaintiffs' counsel submitted invoices totaling $205,521.39 to counsel for Detroit Diesel on January 23, 2006.   Under the terms of the Memorandum of Settlement, payment by Detroit Diesel was due on or before March 24, 2006.

16.     Detroit Diesel did not pay the invoices for attorneys' fees and costs and expert technical fees and costs, in whole or part, on or before March 24, 2006.

17.     On March 30, 2006, Plaintiffs' counsel wrote to counsel for Detroit Diesel (PE HH)  expressing concern about the lack of a written agreement concerning the

9

engine installation and shipyard, confirmation that the engines had been ordered and the lack of payment of fees and costs.

18.     Counsel for Detroit Diesel responded on March 31, 2006 (DE 12) advising that the letter had been passed on to their client and a response could be expected in two weeks.

19.     On April 19, 2006, Plaintiffs' counsel again wrote to counsel for Detroit Diesel (PE JJ) giving formal notice of breach of the settlement agreement based on the lack of a written agreement with regard to the shipyard and installation work, non-payment of attorney and expert fees and costs and failure by Detroit Diesel to provide any information as to the scope of work necessary to install the 2000HP engines.  This was followed by an e-mail exchange between counsel on April 21, 2006. (PE KK)

20.     On April 28, 2006, Plaintiffs' counsel again wrote to counsel for Detroit Diesel (DE 23) referencing a telephone conference on that same day in which the failure of Detroit Diesel to pay fees and costs was discussed.  The letter also requested a detailed protocol for the modifications to the vessel and a written agreement confirming the ship yard and dates for starting and completing the work.

21.     On May 3, 2006, Detroit Diesel's counsel wrote to Plaintiffs' counsel (PE LL) stating that Detroit Diesel was issuing checks payable to Houck Anderson, P.A. in the amount of $150,000 for attorneys' fees and costs and $39,008.23 in expert technical fees.

22.     In a letter dated May 9, 2006, referring to an intervening request from Plaintiffs' counsel that Detroit Diesel revisit the issue of attorneys' fees and costs, Counsel for Detroit Diesel declined to do so and confirmed that they were issuing

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

checks payable to Houck Anderson, P.A. in the amount of $150,000 for attorneys' fees and costs and $39,008.23 in expert technical fees. (PE MM)

23.     Plaintiffs filed their Motion to Enforce Settlement on May 26, 2006.

24.     On June 12, 2006, Detroit Diesel tendered a check payable to "Houck, Hamilton & Anderson, P.A." in the amount of $189,008.23 that required Plaintiffs' counsel to execute a "receipt" for the check acknowledging that the check was for "...full and final settlement of all claims." (PE NN)  Plaintiffs' counsel declined to execute the "receipt" or accept the check on the grounds that its acceptance required a release; it should have been made out to Gerald Abrams; and it was for the wrong amount. (PE OO)

25.     On June 14, 2006, as reflected in the letter of counsel for Detroit Diesel of that date, (DE 32) Plaintiffs' counsel again requested information as to the specifics of the work to be performed on the vessel and an exact scope of work.  Counsel for Detroit Diesel agreed to contact their client and try to obtain the information requested.

26.     On July 6, 2006, counsel for Detroit Diesel wrote to counsel for Plaintiffs responding to their earlier requests for a description of the scope of work to be performed. (PE PP) Specifically, counsel for Detroit Diesel advised Plaintiffs' counsel that the transmissions would not be available until the first week of November, that "...the engine configuration with the ZF marine transmission that Viking currently installs will not fit in Mr. Abrams boat."; and that Detroit Diesel had selected the Twin Disc 6598 DC transmission to be used in the engine installation, which would take place at Cable Marine.

11

27.    On July 12, 2006, counsel for Detroit Diesel again wrote to Plaintiffs' counsel (PE QQ) responding to their request that Detroit Diesel reconsider its position with regard to fees and costs by considering a portion of the additional fees requested as expert technical fees provided by their in-house technical consultant.  Referring to a June 28, 2006 e-mail, Defense counsel stated that Detroit Diesel was willing to re-consider its position if they were provided with proof of these expenses in the form of a breakdown of such fees and costs.

28.    In the same letter, counsel for Detroit Diesel again tendered a check in the amount of $189,008.23  However, as pointed out by Plaintiffs' counsel in their letter of July 17, 2006 (PE RR), returning the check, the check, on its face, required two signatures to be negotiable but contained only one signature.  With their letter of July 17, 2006, Plaintiffs' counsel provided a detailed breakdown of the time spent by their in-house expert for which reimbursement was being sought as requested by Detroit Diesel.  They also provided additional evidence of checks and invoices reflecting direct payments made by their firm to another expert, Exponent, in the amount of $4,080.00

29.    On August 2, 2006, Plaintiffs tendered the vessel to Detroit Diesel for the beginning of the engine removal and installation process. (PE TT)

30.    On August 3, 2006, counsel for Detroit Diesel tendered another check in the amount of $189,008.23 and advised that Detroit Diesel was reviewing the recently submitted detail regarding the expert technical services provided by the in-house expert and would advise in the short term as to whether another check would be issued. (PE UU)

31.    The invoices for Plaintiffs' in-house expert and Exponent remain unpaid.

12

32.     On October 12, 2006, counsel for Detroit Diesel advised Plaintiffs (PE DDD) that the gears had arrived, Cable Marine could start work anytime between October 18 and October 23, 2006 and requested when the vessel would arrive at Cable Marine.

33.     Counsel for Plaintiffs responded on October 16, 2006 (PE EEE) advising that they still needed detailed information relating to the repair plan, repair schedule and exactly what would be done to the vessel. They also advised Detroit Diesel that they had not received sufficient information regarding the changing of the gears from the standard ZF gears normally fitted with the 2000 HP engines, to the Twin Disc gear that Detroit Diesel proposed using. Among things, Plaintiffs requested Detroit Diesel to provide them, prior to starting work, with a detailed description of the work to be performed, payment arrangements and guarantees and a protocol of sea trials to be performed after the installation was completed.

34.     The parties were unable to work out their differences and proceeded to the evidentiary hearing on the Motion to Enforce Settlement.

## **CONCLUSIONS OF LAW**

The interpretation of a contract is a question of law for the court to decide. If the agreement is thought to be ambiguous or unclear, and therefore not susceptible to interpretation as a matter of law, the intent of the parties is to be determined by the trier of fact. Chrysler Corp. v. Brencal Contractors, Inc., 146 Mich. App. 766 (Mich. Ct. App. 1985)

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

**The Parties entered in to a valid settlement agreement signed by both Parties.**

The Court finds as a matter of law that the terms and conditions of the contract are not ambiguous.  As stated in <u>Hamilton Const. Co. v. Board of Public Instruction</u>, 65 So. 2d 729, 731 (Fla. 1953) if the parties selected the language of the contract, and it's clear and unambiguous, a court has no right to give it a meaning other than that expressed in it. To hold otherwise would be to do violence to the most fundamental principle of contracts. *Citing* 17 C.J.S., Contracts, § 296, p. 695.

A complete written settlement agreement was forged at mediation.  The only settlement agreement at issue is the handwritten Memorandum of Settlement signed at mediation by all parties and filed with the Court.  (*See*, Exhibit A to Motion to Enforce). The validity of that agreement has been confirmed by both Parties in their correspondence, pleadings and presentations to the Court. The Parties reached a final settlement at mediation on November 18, 2005.  Although the Parties apparently agreed to draft and intended to execute a subsequent, more formal typewritten settlement agreement, including a confidentiality agreement, that was never accomplished. Thus, the only "settlement agreement" that Plaintiffs' can seek to enforce is the handwritten Memorandum of Settlement executed by the Parties at mediation.

**The Elements of a Valid Contract Are Satisfied**

The Court has the power to enforce the settlement agreement. It is well-settled that a federal court may, under its ancillary jurisdiction, retain jurisdiction over a settlement agreement in a dismissal order if the parties agree <u>Kirke v. Howe,</u> 1999 U.S. App. LEXIS 5697 (2d Cir. 1999)

14

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

Plaintiffs have clearly met their initial burden regarding the existence of a valid and enforceable contract.  Silicon Image, Inc. V. Genesis Microchip, Inc. et al 271 F. Supp 2d 840 (E.D.Va 2003).   The testimony establishes that the agreement was the joint product of all the participants jointly at mediation and, thus, can not be construed against Plaintiffs.  Attorney Matthew J. Valcourt merely acted as the scrivener of the agreement with all parties contributing to the terms.  In Silicon Image Inc. above, the court found that because the agreement was negotiated and drafted by both parties in a joint drafting session, that the presumption against the drafter was inapplicable citing Hendricks v. Brown & Root Inc. 50 F. Supp. 2d 527, 533 (E.D. Va. 1995).   In the process of defining the objective intent of the parties, a court must examine the entire agreement. The court in Williams v. Metzler, 132 F.3d 937, 947 (3d Cir. 1997) stated that: "a writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2). As a corollary rule, an "ambiguous subsidiary contractual provision must be given an interpretation consistent with the dominant purpose of the contract." Barco Urban Renewal, 674 F.2d at 1009.  As an additional aid to proper construction, the court should consider the situation of the parties, the attendant circumstances and the ends they sought to achieve. Id. at 1007, quoting Atlantic N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 96 A.2d 652, 656 (N.J. 1953); see also Restatement (Second) of Contracts § 202(1) (Emphasis supplied)

The Court finds there is a valid and enforceable contract.  Hyde Park Union Church v. Curry, 942 F. Supp. 360, 363 (N.D. Ill. 1996) There is a writing compliant with the statue of frauds, signed by all parties, expressing terms of the agreement and the

15

duties of each party, written out in the presence of the mediator and all parties.  There was mutual assent to the terms, opportunity to jointly draft the agreement, and consideration for both parties.  The parties reached agreement on all the material terms at mediation which was essentially to make Plaintiffs whole.

Applying the law to the facts of this case and the issues raised by the Motion to Enforce Settlement, the Court further finds as follows:

### **Plaintiffs' Claim for Attorneys' Fees and Costs and Expert Technical Costs.**

Under the terms and conditions of the Memorandum of Settlement, Detroit Diesel was clearly obligated to pay Plaintiffs up to $150,000 for their attorneys' fees and costs and up to $60,000 for their "expert technical" fees and costs on or before March 24, 2006.  It is undisputed that Detroit Diesel did not pay anything by that date. It is also clear that the only real dispute between the parties concerns the $13,317.00 claimed by Plaintiffs for certain services provided by their counsel's in-house technical expert Captain Christopher Karentz.  Detroit Diesel does not dispute that they owe, and have not paid, $4,080.00 for the expert technical services provided by Exponent.  Nor has Detroit Diesel provided any explanation or justification for their failure to pay the amount of fees and costs not in dispute, $189,008.23, on time prior to their successful tender of a negotiable check in that amount on August 3, 2006.

The Court finds that Plaintiffs are entitled to recover interest on the $189,008.23 from March 24, 2006 when due until August 3, 2006 when actually paid.  The Court further finds that Plaintiffs are entitled to recover $4,080.00 for the Exponent invoices together with interest from March 24, 2006 until paid.

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

Although Detroit Diesel has stated that they would consider paying the $13,317.00 for the services rendered by Captain Karentz, that amount remains unpaid. Detroit Diesel argues that reimbursement of "expert technical" fees and costs must be limited to those experts who were disclosed as expert witnesses whose testimony was intended to be presented at trial.  This was not a restriction included by Detroit Diesel in the Memorandum of Settlement. Since Captain Karentz was never disclosed prior to trial as an "expert witness" and would not have testified as such at trial, Detroit Diesel declined to pay the $13,317.00 for his services.

The testimony of Gerald Abrams (T2, p15, 12 to p16, L20; p22, L22 to p23, L10; p23, L20 to p24, L1) and the descriptive invoices presented to Detroit Diesel (PE RR) establish that the services rendered by Captain Karentz were of an expert technical nature.   The plain language of the Memorandum of Settlement does not limit the reimbursement of "expert technical" fees and costs to expert witnesses.   Captain Karentz was not an attorney, and the fees charged for his expert technical services were clearly not "attorneys" fees to Plaintiffs, they were "expert technical" fees. Accordingly, Plaintiffs are entitled to recover the $13,317.00 from Detroit Diesel together with interest from March 24, 2006 until paid.

Plaintiffs are entitled to prejudgment interest on the damages they have been awarded.  See, Sunderlin Marine Mutual Insurance Company, Ltd. vs. Weeks Marine Construction Company, 338 F.2d 1276, 1280 (11th Cir. 2003) "it is the general rule of this circuit to award prejudgment interest in admiralty cases."  Insurance Company of North America v. M/V OCEAN LYNX, 901 F.2d 934, 942 (11th Cir. 1990).  Prejudgment interest should be awarded as a rate equal to the average of prime rate from the date of

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

damage until the day the judgment against the defendant is entered.  <u>Sunderlin Marine</u>, 338 F.3d at 1280 ("the rate of prejudgment interest that should be awarded is the prime rate during the relevant period.")   See <u>Kilpatrick Marine Piling vs. Firemen Funds Insurance</u>, 795 F. 2d 940, 947 (11th Cir. 1986). The prime rate in effect on March 24, 2006 was 7.5%

### Whether the Obligation of Detroit Diesel to Pay All Costs for Installing the New, Larger Engines Includes an Obligation to Pay the Cost of Modifying the Exhaust and/or Propellers as Necessary to Properly Operate With the Larger Engines

Under the Memorandum of Settlement, Detroit Diesel agreed to install two new factory built 2000HP 16V2000 in Plaintiffs' boat, including all new gears and accessories for engines, and to pay all costs for installation, including all accessories. The Memorandum of Settlement also called for Detroit Diesel to provide a five-year warranty to commence after installation and a successful sea trial of the vessel and the engines.

After settlement and some time during the engineering and cost analysis, Detroit Diesel took a new position that it would now not pay for all costs of the of installing the new engines and all costs of the installation.  Specifically, Plaintiffs argue:

1.     The clear language of the Memorandum of Settlement requires Detroit Diesel to pay all costs of installation without any limit stated as to the amount of cost or scope of work that they will or will not pay for to install the engines.

2.      The Memorandum of Settlement makes no mention whatsoever of Plaintiffs having to pay for **anything** in connection with the removal of the old engines and the installation of the new engines.

3.      The intent of the Parties was that Plaintiffs would not bear any portion of the cost of the installation of the new engines.

4.      The Memorandum of Settlement requires that the new engines and vessel successfully pass a sea trial after installation and Detroit Diesel agreed to pay any for the cost of any work necessary for the engines to pass a sea trial.

5.      Detroit Diesel was fully aware, when it signed the Memorandum of Settlement, that there were unanswered technical questions as to what would be required to install 2000 horsepower engines in a 65-foot Viking designed and built for 1800 horsepower engines, something they had never attempted previously, and, nevertheless, placed no limit on how much or what Detroit Diesel would pay for and inserted no language requiring Plaintiffs to pay for any aspect of the installation.

6.      The cost of modifications to the exhaust system was specifically discussed at mediation as something that Detroit Diesel would pay for.

Specifically, Plaintiff Gerald Abrams unrefuted testified that, at mediation, he discussed the possible need to modify the exhaust with Ulrich Kemnitz, head of Detroit Diesel's North American operations, and was advised by Kemnitz that Detroit Diesel would whatever was necessary to make the larger engines work in Plaintiffs' vessel but they were not going to pay for any defects discovered in the hull. (T2, p35, L18 to p37, L11)

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044    FAX (305) 372-5044    www.houckanderson.com

Detroit Diesel argues that, as an engine manufacturer, Detroit Diesel does not manufacture or sell exhaust systems or propellers.  Further, argues Detroit Diesel, the word "accessories", as used in the Memorandum of Settlement, must be interpreted in light of the fact that Detroit Diesel does not include exhaust systems or propellers among the "accessories" that it sells with its engines.

The testimony of Detroit Diesel's own representatives at mediation provides considerable support for Plaintiffs' position.

Brian Howe, Detroit Diesel's Customer Service Support Manager and a mechanical engineer, was very familiar with the background and history of Plaintiffs' port engine problem.  He attended the mediation as a Detroit Diesel representative. Howe testified that the intent of Detroit Diesel in negotiating the memorandum of settlement was "…to make Jerry Abrams whole." (T1, p78, LL 19-23) Further, Howe testified that one of the first things he did after the mediation was to inspect Plaintiffs' vessel to ensure that there was nothing on the part of the vessel that was causing the problem or that would interfere with the proper operation of the new engines. (T1, P83, L24 to p84, L13)

Brian Howe further testified that it was originally his understanding of the settlement that the re-powering would be done at no cost to Mr. Abrams and the expense would be borne by Detroit Diesel.  In other words, the entire cost of the installation would be paid by Detroit Diesel and Plaintiffs would not have to pay anything. (T1, p89, L 23 to p90, L12)  Howe also testified that he had never been involved in the replacement of 1800 horsepower engines with 2000 horsepower engines

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

before, and had never done an engine replacement as part of a litigation settlement. (T1, p72, L24 to p78, L7; p 134, L23 to p 135, L2)

Howe testified that if asked at mediation he would have said that the propellers of Plaintiffs' boat would have to be changed as a result of the installation of the larger engines. (T1, p96, L19 to p98, L12) Howe also testified that it was more likely than not than the vessel's exhaust was going to have to be modified in order for the larger engines to perform properly.  (T1, p 103, LL 9-17)  Howe also testified that after the installation of the larger engines the exhaust would be on the edge of being undersized or actually undersized, and the better practice would be to increase the size of the exhaust at the same time the larger engines were installed. (T1, p105, L18 to p107, L9) According to Howe, the cost of increasing the size of the exhaust system would be as much as $75,000, while the cost of the other engine installation work would be $100,000, but no one at mediation, including Detroit Diesel, appeared too concerned about the potential extra cost.  (T1, p130, L 15 to p131, L21)

The Court also heard the testimony of Scott Woodruff, another mechanical engineer, and Detroit Diesel's national marine technical service manager, who also attended mediation on behalf of Detroit Diesel.  Scott Woodruff agreed with Brian Howe that, in entering the settlement agreement, it was the intention of Detroit Diesel to make Plaintiffs whole. (T1, p154, LL 18-21) Acknowledging that this was his first project involving the installation of 2000 horsepower engines in a 65-foot Viking designed for 1800 horsepower engines, Scott Woodruff testified that, at mediation, the parties recognized that there were some technical uncertainties with respect to exactly how the 2000 horsepower engines would mate up with an engine room set-up for 1800

21

horsepower engines, and that engineering details that would have to be studied, but nothing appeared to be insurmountable. (T1, p 151, LL 5-23; p155, LL16-20)

Significantly, Woodruff also testified that when negotiating the Memorandum of Settlement, Detroit Diesel was not trying to fine tune all of the components at the time of mediation because the concept of the agreement was to make Mr. Abrams whole as their primary objective. So, testified Woodruff, whether the engine gear package was ten per cent, or twenty per cent more than Detroit Diesel was conceptualizing at the time of mediation, Detroit Diesel recognized that would be a risk Detroit Diesel would take to get the matter settled. (T1, p173, L24 to p174, L16)

Woodruff also confirmed that Detroit Diesel had offered to fund a set of custom propellers for Plaintiffs' vessel as a solution to the earlier port engine power problem. (T1, p 146, LL 13-19).  He also conceded that he was aware at mediation of the potential that propellers designed to operate with 1800 horsepower engines would not draw the full power of the 2000 horsepower engines. (T1, p188, LL 2-7)

Detroit Diesel's expert, Stewart Hutcheson, testifying by deposition, stated that, based on his experience in installing larger engines in a vessel, that there was a sixty-five per cent (65%) probability that proper operation of the larger engines would require an increase in the engine exhaust capacity and a forty per cent probability that new propellers would be required. (Hutcheson Deposition, p 82, L1 to p83, L9; P94, L4 to p95, L8; p 103, L17 to p105, L12)

Plaintiffs' expert, Dr. Lee Swanger, also opined that it was more likely than not that unless the size of the exhaust is increased, there will be excessive back pressure

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

with the larger engines that would prevent the larger engines from actually producing the contracted 2000 horsepower. (T1, p196, L20 to p198, L13; p218, LL15-20)

The overwhelming weight of the evidence is that it is more likely than not that in order for the larger, 2000 horsepower engines to be installed in Plaintiffs' vessel to develop their full power, both a larger exhaust system and different propellers will be necessary, something recognized by Detroit Diesel as a possibility, if not a highly likely probability at mediation.  Detroit Diesel also recognized, at mediation, that they had never before installed 2000 horsepower engines in a 65-foot Viking designed for 1800 horsepower engines and there were technical and engineering uncertainties as to what would be required.   In addition, Scott Woodruff agreed that provision in the Memorandum of Settlement, that there had to be a successful sea trial of the engines and vessel after installation, was an important term and condition of the mediation agreement.  (T1, p 185, LL 12-25) Both Woodruff and Howe agreed that a successful sea trial meant that the newly installed engines would be able to develop their full 2000 horsepower at 2350 engine revolutions per minute. (T1, p 60, L11 to p 61, L18; p 185, LL 12-25)  Given the testimony of Howe, Hutcheson and Swanger that it was more likely than not that the larger engines could not successfully pass a vessel sea trial without a larger exhaust and new propellers, the engine installation would necessarily have to include an increased exhaust and modified propellers in order to achieve an important and material condition of the settlement. Thus, the full intent of the parties and the engineering certainty known at the time of drafting the Memorandum of Settlement dictate no other interpretation of the contract that propellers and exhausts were part of the bargain struck by the parties to be funded by Detroit Diesel.

23

It is extremely difficult for the Court to reconcile the present position of Detroit Diesel, that Plaintiffs must pay the $65,000 to $75,000 cost of an enlarged exhaust system, plus the cost of new propellers in order to make the new engines work properly and for Detroit to perform its duty of a successful vessel seatrial under the Memorandum of Settlement. This bizarre interpretation is controverted by Detroit Diesel's witnesses, Howe and Woodruff, that it was the intent of Detroit Diesel in the settlement agreement "to make Jerry Abrams whole."

That end can only be achieved by Detroit Diesel paying the entire cost of the engine and repair installation, including whatever exhaust system and propeller modifications may be necessary for the larger engines to achieve their full power and the vessel to pass a successful sea trial. Otherwise, the result would be to shift the out-of-pocket expense of an exhaust system and propellers appropriate to the larger 2000 horsepower engines, an amount equivalent to what Detroit Diesel will pay for the removal and installation of the engines themselves, to Plaintiffs. This outcome is neither consistent with the language of the Memorandum of Settlement nor the original intent of the Parties as described by Brian Howe, Gerald Abrams, and Scott Woodruff.

Detroit Diesel's argument that they are not in the business of selling exhaust systems or propellers and that their engine "accessories" do not include exhausts or propellers may be factually correct, but misses the point entirely and is not relevant to the plain language of the settlement. The Memorandum of Settlement is not a contract for the sale of the 2000 horsepower engines by Detroit Diesel to Plaintiffs. It is an agreement as to what Detroit Diesel agreed to pay to settle a law suit. Under the plain language of the Memorandum of Settlement, Detroit Diesel, despite their acknowledged

24

uncertainty as to what would be required or how much it would cost, agreed to pay all the cost of installing the larger engines; placed no limit on what they would spend to do so; and made no provision for any part of the cost to be borne by Plaintiffs.

The previous willingness of Detroit Diesel to pay for propellers to solve an engine performance problem was readily admitted by Howe and Woodruff.  There is no logical reason why an exhaust system would not also be included among work Detroit Diesel was willing to fund if necessary for the proper operation of an engine installation as part of a litigation settlement, whether or not exhaust systems or propellers are or are not listed as "accessories" on the Detroit Diesel specifications for the engines.  The Court can only conclude that Detroit Diesel decided, after the execution of the Memorandum of Settlement, to try to reduce its out-of-pocket cost for the engine replacement by attempting to shift a significant portion of the cost to Plaintiffs.  The language of the Memorandum of Settlement makes no provision for Plaintiffs to bear any portion of the cost of an engine installation sufficient for the engines or vessel to pass a sea trial.

The Court finds that under the Memorandum of Settlement, Detroit Diesel is obligated to pay for all the costs of installing the new engines in Plaintiffs' vessel, including whatever modifications to the exhaust systems, propellers or other components that may be required for the engines and vessel to successfully pass a sea trial and to place the interior and exterior of the vessel cosmetically in a like condition to its current condition.

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

**Whether Detroit Diesel Failed to Provide a Written Agreement and Scope of Work**

The Memorandum of Settlement provides that installation of engines and gears and removal of engines and gears was to be performed "…at a mutually agreeable shipyard(s) by the parties in writing." It is undisputed that there was never any written agreement reached between the Parties with regard to where the work would be done or as to how the installation would proceed. It is, however, clear from the evidence, testimony, and post-mediation conduct of the Parties, that the Parties contemplated that, after the technical uncertainties were resolved by an engineering analysis of the work necessary to affect the installation was complete, a more detailed agreement would be drafted by the Parties.

Plaintiffs have consistently maintained that the intent of the Memorandum of Settlement that the Parties would enter into a written agreement with regard to the shipyard to do the work and the scope of work to be performed. This is a material term of the contract. As early as March 30, 2006, counsel for Plaintiffs requested such a written agreement, and on several occasions thereafter. The correspondence placed into evidence established that the necessity for and importance of a written scope of work was emphasized by Plaintiffs' counsel throughout the post-mediation negotiations. Plaintiffs also sought, not unreasonably, written arrangements for payment of the work from Detroit Diesel to the shipyard. However, Detroit Diesel did not produce anything resembling a written scope of work, a single sheet of paper describing the work to be done in general terms, until December 5, 2006.

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

Detroit Diesel argues that Gerald Abrams did not object to Cable Marine as the shipyard to do the work and Plaintiffs could have prepared a written agreement if they wanted one.

While it appears clear Plaintiffs have never objected to Cable Marine as a shipyard that could do the engine removal and replacement work, the requirement of a written agreement is a clear and material requirement of the Memorandum of Settlement.  Moreover, according to Detroit Diesel's own expert, Stewart Hutcheson, it is good marine practice for a work project of the magnitude involved in removing and re-installing engines to require a detailed, written scope of work describing the work to be performed from beginning to end. (Hutcheson Deposition, p 64, L6 to p65, L19; p 90, L4 to p 91, L 24)

Plaintiffs' expert surveyor, Richard Learned, also testified that the preparation of a detailed, written scope of work for a project of the type being undertaken by the Parties in the Memorandum of Settlement was a standard industry practice and was considered to be good marine practice. (T2, p 81, L 13 to p 84, L 25) This was especially true when Detroit Diesel began to take positions post settlement that it would not pay for all the costs of installation.

Further, given the testimony of Brian Howe that, as between Plaintiffs and Detroit Diesel, it was Detroit Diesel that undertook the responsibility  to do the engineering work and analysis to affect the installation of the engines (T1, p 85, LL 14-21) and Detroit Diesel did, in fact, deal directly with Viking, Cable Marine and Twin Disc, Plaintiffs' position that Detroit Diesel was, therefore, in the best position to prepare an initial draft of a written agreement identifying the shipyard to do the work, the scope of work to be

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

performed and the payment arrangements is logical and consistent with industry practices as established by the testimony of both Plaintiffs' and Defendant's experts.

Accordingly, the Court finds that the Memorandum of Settlement requires that there be a written agreement between the Parties detailing the scope of work to be performed, the shipyard to do the work, and the payment arrangements and that Detroit Diesel should prepare the first draft of such an agreement. Further, in order to expedite the process of arriving at such an agreement, the Court suggests, but does not order, that the Parties charge their expert surveyors, Mr. Learned and Mr. Hutcheson, with the preparation of the first draft of such an agreement rather than having counsel involved, at least at that stage of the drafting.

### Detroit Diesel Unilaterally Decided to Install Twin Disc Gears

Plaintiffs also object to the action taken by Detroit Diesel to install two Twin Disc transmissions with the new engines instead of the ZF 2555 transmissions they thought they were to receive. Plaintiffs argue that the Twin Disc gears are not appropriate for use in a 65-foot Viking with 2000 horsepower engines and constitute a non-standard installation that will adversely affect the market value of their vessel. Plaintiffs argue that an engineering analysis by Viking, started but never finished, to determine how to install the new engines with ZF 2555 gears was, in fact, completed, it would establish that the new engines could be installed in their vessel in a manner that would allow the use of ZF gears. Alternatively, Plaintiffs argue, they should be financially compensated any loss of market value resulting from the use of Twin Disc gears in their vessel.

Plaintiffs made numerous efforts to research the suitability of the Twin Disc gear for use with the M91 engine. Detroit Diesel's expert, Stewart Hutcheson, agrees that he

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

too would be reluctant to accept a gear unless there was confirmation that its rating was compatible with the engine and that good marine practice required such research. (Hutcheson Deposition p 53, L 16 to p 54, L8)

Detroit Diesel's Scott Woodruff testified that, in entering the settlement agreement, it was the intention of Detroit Diesel to make Plaintiffs whole. (T1, p154, LL 18-21) He also testified that, at mediation, Detroit Diesel recognized that there were technical uncertainties with respect to exactly how the 2000 horsepower engines would be installed and engineering details that would have to be studied. (T1, p 151, LL 5-23; p155, LL16-20)  Woodruff also testified whether the engine gear package was ten per cent, twenty per cent more than Detroit Diesel was conceptualizing at the time of mediation, Detroit Diesel recognized that would be a risk Detroit Diesel would take to get the matter settled. (T1, p173, L24 to p174, L16)

Gerald Abrams testified that it was his understanding as to what Detroit Diesel was agreeing to supply under the Memorandum of Settlement was new 2000 horsepower engines with ZF 2555 gears. An important factor to Gerald Abrams because one of his primary objectives in negotiating the settlement was to restore what he perceived as lost market value to the vessel (T2, p 33, LL 3-20)

The testimony of Brian Howe of Detroit Diesel supports the accuracy of Mr. Abrams understanding as to the agreement between the Parties. Howe testified that he came out of the mediation with the understanding that his job, on behalf of Detroit Diesel, was to provide Plaintiffs with new 16V 2000 M91 engines in a package identical to the then current standard 65-foot Viking, 2000 horsepower production package including ZF 2555 gears.  (T1, p 69, LL 3-7; p 87, LL 2-11; p 112, LL 11-17)  Howe also

29

testified that Gerald Abrams was aware that was the intent, to "clone" the 65-foot Viking production package with 2000 horsepower engines.  (T1, p 125, L 24 to p 126, L 8) Thus, it is clear that the original intent of the Parties was that Detroit diesel would install two new 2000 horsepower engines with ZF2555 gears in Plaintiffs' vessel.

Both Howe and Woodruff testified that after Detroit Diesel started working with Viking on an engineering analysis of what would be required to install the 2000 horsepower engines in Plaintiffs' boat with the ZF gears; they became aware that the standard bottom configuration on the 65-foot Viking has been changed from a flat bottom to a tunnel drive hull.  Therefore, installing the 2000 horsepower engines into Plaintiffs vessel with ZF 2555 gears would not be a simple "drop in" operation.  The results of the preliminary engineering analysis by Viking indicated that the installation would require modification of the engine mountings, moving the engine aft and other changes.  Accordingly, Detroit Diesel did not complete the engineering analysis of an installation with ZF gears and decided to pursue alternative solutions. (T1, p 86, L 15 to p 91, L 8; p 155, L 22 to p 157, L 15)    Ultimately, Detroit Diesel decided to use a Twin Disc gear for the installation instead of the ZF 2555 gear that Plaintiffs thought they would receive.  Scott Woodruff testified that he did not consult with Plaintiffs on the change to the Twin Disc gear because he never considered that it would be an issue. (T1, p 164, LL 9-12)

Plaintiffs, however, view the change from a ZF 2555 gear to a Twin Disc gear as a major issue. In support of their position, Plaintiffs offered the testimony of Dr. Swanger, an expert in mechanical engineering and metallurgy, who testified that, in his opinion, while the ZF 2555 gear was entirely appropriate and suitable for use with the

30

M91 engine, the Twin Disc 6598 DC gear that Detroit Diesel proposes to use is not. Dr. Swanger opined that based on the data published by Twin Disc as well as the data provided by Twin Disc to Detroit Diesel, the Twin Disc 6598 DC gear can only absorb 1973 brake horsepower while the M91 engine can put out as much as 2040 brake horsepower. Accordingly, testified Dr. Swanger, the Twin Disc gear would have a substantially reduced service life and is not an appropriate gear to use with the M91 engine. (T1, p 204, L 13 to p 207, L11; p 207, L 20 to p 209, L 21)

Plaintiffs also offered the testimony of Richard Learned, a certified marine surveyor as well as an accredited marine appraiser, who opined that, in addition to questions concerning the adequacy of the Twin Disc gear, the presence of a Twin Disc gear in a 65-foot Viking with 2000 horsepower engines would be viewed by potential buyers as a non-standard installation that would substantially reduce the market value of the vessel and entirely negate the Plaintiffs' objective of restoring the market value lost when the vessel was stigmatized by its history of engine problems. (T2, p 92, L 2 to p 95, L 1) Detroit Diesel's expert, Stewart Hutcheson, agrees with Learned that if the installation with the ZF gear is engineered and approved by Viking, it will restore any market value lost by the vessel. (Hutcheson Deposition, p 60, L 20 to p 62, L 3)

Learned also testified that he had conducted a feasibility study to determine whether it was possible to install the M91 2000 horsepower engines into Plaintiffs' vessel with the ZF 2555 gears without major structural changes such as relocating engine room bulkheads. Learned opined that if Viking were to complete the engineering analysis that Detroit Diesel abandoned in favor of the Twin Disc 6598 DC gear, the result would be a determination that it was feasible to install the M91 engine in Plaintiffs'

31

65-foot Viking with the ZF 2555 gears by moving the engine aft and making other modifications to the engine mountings without having to move the engine bulkhead or make other major structural modifications to the vessel. (T2, p 106, L 21 to p107, L 4) Learned also testified that from the unfinished engineering analysis conducted by Viking, that Viking favored the use of the ZF 2555 gear instead of the Twin Gear and would do so in a manner similar to that he described. (T2, p 148, LL 10-16)

To counter the testimony of Dr. Swanger and Mr. Learned, Detroit Diesel offered the testimony of Thomas Schoepel, A Twin Disc employee.  Mr. Schoepel conceded that the information available to the public, published on the Twin Disc web site and contained in the Twin Disc literature, reflected a rating for the Twin Disc 6598 DC gear of 1931 brake horsepower that was incompatible with an M91 2000 horsepower engine. (T2, p 179, l1 to p 181, L6)  Mr. Schoepel also admitted that Dr. Swanger's analysis of the error contained in the mathematical calculations contained in his letter to Detroit Diesel concerning the rating of the 6598 DC gear was correct. (T2, p 61, LL 2-20) Mr. Schoepel also agreed with Mr. Learned that an engine surveyor would question the presence of a Twin Disc gear in a 65-foot Viking with 2000 horsepower engines and find it a highly unusual, out of the ordinary situation. (T2, p 181, L 7 to p 182, L 5) Mr. Schoepel also testified that Twin Disc had increased the rating of the 6598 DC gear, previously rated for only 1973 brake horsepower, so that it could be used with the M91 2000 horsepower engine, which can develop up to 2040 brake horsepower, a difference of as much as 77 horsepower, on the basis of an supposed engineering analysis without making any physical changes or modifications to the gear.  (T2, L 184, L 18to p 185, L 11) Twin Disk never produced any records pursuant to the subpoena served

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

upon the corporation requesting this type of technical information.   In addition, Mr. Schoepel conceded that his testimony about the rating of the gear was the first time that accurate information about the rating of the 6598 DC gear was being provided. (T2, L16 to p 188, L19)  This testimony carries little weight in light of the fact that none of this subpoenaed information was previously provided.

Nevertheless, as testified Mr. Schoepel, Twin Disc rated the 6598 DC gear as appropriate for use with the M91 engine and was providing a two year warranty on the gear when used with the M91 engine. (T2, p 188, LL 4-19)

The issue of whether the Twin Disc gear is suitable for use with the M91 engine is a significant one.  As stated by Scott Woodruff, if the Twin Disc 6598 DC is not the correct gear to use with the M91 engine, it could malfunction and cause damage to the gear and or the engines. (T1, p 172, L 22 to p 172, L 8)  Further, as pointed out by Dr. Swanger, the willingness of Twin Disc, or Detroit Diesel for that matter, to provide a two year warranty on the gear does not mean that Plaintiffs will have a trouble free operation, it only that they will pay to fix it if it breaks. Plaintiffs will still have to endure the inconvenience and loss of use associated with a gear failure and thus be further deprived of their hard fought bargain to be made whole. (T1, p 215, LL 6-23)

Of course, the provision of a ZF 2555 gear will not guarantee Plaintiffs trouble free operation either. However, the evidence establishes that it was the intent of the Parties that Plaintiffs would receive a ZF 2555 gear with each engine.  The question is whether Plaintiffs bear the risk of the Twin Disc gear not being the appropriate gear for use with the M91 engine when the ZF gear they thought they would receive clearly is an appropriate gear or whether Detroit diesel should bear the cost of providing Plaintiffs

33

with the ZF gears? The evidence strongly suggests that the unilateral decision of Detroit Diesel to abandon the effort to install ZF gears with the engines was not because it was either impossible or impractical to do so, but because it would be cheaper and easier to substitute the Twin Disc gear because it was the same size (footprint) as the original gear. However, the $65,000 cost of modifying the engine room to accommodate the ZF gears is well within the twenty per cent additional cost range that Scott Woodruff testified that Detroit Diesel was originally willing to risk to settle the case. It would, therefore, appear that Detroit Diesel apparently had remorse, post-mediation, as to what they were willing to pay to accomplish the installation in violation of the Memorandum of Settlement.

Remorse, however, does not change what was agreed. The evidence establishes that it was the intent of the Parties that Plaintiffs would receive ZF 2555 gears with the engines.  The Court finds that under the Memorandum of Settlement, Detroit Diesel is obligated to cooperate in good faith with Plaintiffs and Viking to complete the engineering analysis necessary to install the M91 engines into Plaintiffs' vessel with ZF 2555 gears and to pay for the necessary modifications to do so.

### Attorneys' Fees and Sanctions

An award of attorneys' fees and sanctions is appropriate given the Court's findings with regard to the actions and conduct of Detroit Diesel.  The testimony of Detroit Diesel's own employees establishes that the refusal of Detroit Diesel to pay for exhaust system and propeller modifications they knew or should have known would be necessary for the larger engines to pass a sea trial was contrary to both the plain language of the Memorandum of Settlement and the stated intent of the settlement.

34

Similarly, Detroit Diesel failed to complete the engineering analysis necessary to provide Plaintiffs with the ZF gears they were to receive and unilaterally substituted another gear delaying the start and completion of the work by months beyond the agreed start date.  The apparent motivation of Detroit Diesel in doing so was not to provide their customers with what they had agreed to provide but to save money.  Given the nature of the obvious, admitted breaches and the amount of attorneys' fees and costs expended by Plaintiffs in forcing Detroit Diesel to comply with the settlement agreement, the Court will award attorneys' fees and costs to Plaintiffs as well as sanctions against Detroit Diesel.

In Lubrizol Corp. v. Exxon Corp., 957 F.2d 1302 (5th Cir. 1992), the court affirmed an award of attorney's fees to appellee corporation as a sanction for appellant corporation's breach of a settlement agreement because appellant's actions involved no direct or deliberate challenge to the scope of the settlement agreement between the parties and was determined to be an obvious breach.

The Court finds Plaintiffs are entitled to recover their attorney's fees, costs, interest and money damages caused by the necessity to file a Motion to Enforce Settlement and the delay of Detroit Diesel Corporation in carrying out their duties under the agreement. The Court reserves jurisdiction to determine the amount of the fees and costs to be awarded pursuant to a separate motion to be filed by Plaintiffs.

The Court has also considered the actions and conduct of Detroit Diesel and the resultant delays in ordering components and arranging for the shipyard and the damages suffered by Plaintiffs as a result.

35

The willful failure of Detroit Diesel to act in good faith to implement the Memorandum of Settlement justifies the imposition by this Court of the sanctions requested by Plaintiffs. Detroit Diesel has not only failed to comply with the settlement agreement, but has deliberately ignored its requirements. As a result, Plaintiffs were required to retain counsel and to take up this Court's time in order to enforce a clear Memorandum of Settlement. The delays and breaches by Detroit Diesel were not justifiable and should be sanctioned.

The Supreme Court in <u>National Hockey League v. Metropolitan Hockey Club,</u> 427 U.S. 639, 642, reh'g denied, 429 U.S. 874, (1976), noted that the sanctioning power of district courts is potent:

> It has long been understood that "certain implied powers must necessarily result to our courts of justice from the nature of their institution," powers "which cannot be dispensed with in a court, because they are necessary to the exercise of all others." For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

The Court further finds that the activities, omissions and actions of Detroit Diesel caused unnecessary cost and expense to FWF, Inc. and Gerald Abrams. Their conduct throughout the course of the litigation was wanton, intentional and reckless with careless disregard for the Plaintiffs.

As a result of these actions and inaction by Detroit Diesel, the Court finds as a matter of law that the Memorandum of Settlement contract was breached by Detroit Diesel, that Plaintiffs' suffered damages in the form of additional attorney's fees and

Houck Anderson, attorneys at law
200 South Biscayne Boulevard, Suite 300, Miami, Florida 33131-2332
Tel (305) 372-9044   Fax (305) 372-5044   www.houckanderson.com

costs, interest, vessel storage and crew wages.  The Court finds as a matter of law that Plaintiffs are entitled to damages including attorney's fees.

The Court finds as a matter of law that due to the bad faith behavior of Defendant Detroit Diesel/ MTU that Plaintiffs are entitled to sanctions in the amount of $100,000.  Further, pursuant to this Court's equity powers, an order shall issue for Detroit Diesel to post a performance bond in the amount of $1,000,000.00 as a guarantee of their future performance of said contract.  The Court finds as a matter of law that there was a valid contract and that specific performance and the bond is an adequate remedy.

The Court finds as a matter of law that Detroit Diesel shall replace the current engines and gears with new 2000 hp M91 engines and new ZF 2555 gears and all necessary equipment, including, but not limited to, upgraded exhaust systems and propellers, to ensure that the newly installed engines and vessel pass a sea trial.

As Judge Gesell stated in Bernstein v. Brenner 320 F. Supp 1080 (D.D.C. 1970)

> "the settlement in this instance was made by experienced attorneys and the courts have long recognized that arms-length dispositions of litigation, particularly settlements made through counsel by sophisticated litigants, cannot  [**20]  lightly be set aside merely because subsequent developments may indicate that the bargain made proved more beneficial to one party than the other." Id. at 1086. See Strange v. Gulf and South American S.S. Co., Inc., 495 F.2d 1235, 1237 (5th Cir. 1974);  Moreover, public policy favors the enforcement of settlement agreements. See Pearson v. Ecological Science Corp., 522 F.2d 171 (5th Cir. 1975) cert. denied, 425 U.S. 912, 47 L. Ed. 2d 762, 96 S. Ct. 1508 (1976).   As cited in Reed v. United States, 717 F. Supp. 1511, 1518 (D. Fla. 1988)

The damages sought by Plaintiffs are allowable under the law.  The damages naturally arising out of the breach are clearly proper if proven.  A Court may properly award compensatory damages for breach of a settlement agreement if it's findings support such an award. "Proof of loss must be presented to justify [a fine's]

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

compensatory aspect." <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1062 (2d Cir. 1995) as cited in <u>Kirke v. Howe,</u> 1999 U.S. App. LEXIS 5697 (2d Cir. 1999)

Sanctions are also proper for bad faith dealings and vexatious delay tactics in complying with the settlement.  In <u>KAPCO v. C & O ENTERPRISES,</u> 886 F.2d 1485, 1490 (7th Cir. 1989), the district court entered judgment for the defendants, finding, among other things,  that Kapco and Friedman "engaged repeatedly in duplicative and vexatious tactics fraught with bad faith in an attempt to unnecessarily prolong this litigation, to harass the defendants, and to drive them out of business."

The amount of sanctions would include the attorneys' fees and costs expended to enforce the agreement, interest on any amounts awarded as due to Plaintiffs and sanctions in the amount of $100,000 to deter future misconduct by Detroit Diesel in this case and in other dealings with the public and to compensate Plaintiffs for the loss of use, inconvenience and delay resulting from the failures of Detroit Diesel.   A determination as to what constitutes an appropriate sanction rests within the sound discretion of the district court. <u>Cheek v. Doe</u>, 828 F.2d 395, 397 (7th Cir. 1987) (per curiam).  The amount of the sanction must be a carefully measured response to the sanctioned conduct and the district court must specify the reasons for the sanction and the manner of computation. <u>KAPCO v. C & O ENTERPRISES</u>, 886 F.2d 1485, 1496 (7th Cir. 1989).   Courts have routinely granted attorneys fees and sanctions for enforcement of valid settlement agreements.  <u>Keifer v. Lithia Motors, Inc.</u>, 2006 U.S. Dist. LEXIS 33720 (D. Or. 2006).

Here the Plaintiffs request ten per cent of the approximate settlement value as a sanction.  Plaintiffs estimate the market value for two new 2000 hp engines, gears and

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044  FAX (305) 372-5044  www.houckanderson.com

accessories and shipyard repair, work and material, cosmetic repair and seatrial costs to be in excess of $1,000,000.  The sanction requested is are not excessive and is sufficient to deter Detroit Diesel from any further bad faith treatment of consumers in the market including Gerald Abrams.  In exercising its inherent power, "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (other citations omitted). In such cases, the imposition of sanctions "transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of 'vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.'" Id. at 46 (quoting Hutto v. Finney, 437 U.S. 678, 689 n.14, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978)) as quoted in Moss v. McDonald's Corp., 2006 U.S. Dist. LEXIS 13936 (D.N.J. 2006).

This Court is not constrained by the contract when granting equitable relief and sanctions for the conduct of Defendants before this Court and can fashion relief including attorneys' fees and punitive damages.

## PLAINTIFFS' ENTITLEMENT TO RELIEF

The Court having found that the contract was breached and that Plaintiffs were damaged as a result of that breach, Plaintiffs are entitled to recover the following damages:

(i) **Money Damages for expert technical fees:** Plaintiffs are entitled payment of the two outstanding Exponent expert invoices totaling $4,080 and in-house

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

expert costs of $13,317.00 and accrued interest calculated at 7.5% from March 24, 2006 until paid.

     (ii)     **Plaintiffs are awarded their attorneys' fees, costs and expert fees;** Plaintiffs may move by separate motion to established the quantum of attorneys fees, costs and expert fees they are entitled to recover for the enforcement of the settlement agreement paid and accrued since March 24, 2006;

     (iii)     **Equitable relief in the form of specific performance and a performance bond:**   Plaintiffs are entitled to full performance of the written Memorandum of Settlement, including all cosmetic and structural work, paint, fabric, carpeting, electrical, water and hydraulic systems, ZF 2555 gears, a properly sized engine exhaust system, propellers and any other components that are necessary to complete the installation of the 16V 2000M91 engines in Plaintiffs' vessel such that the engines and vessel may successfully complete a sea trial. Detroit Diesel is pay all costs of the installation including, but not limited to: the costs of modifying and/or replacing the engine exhaust system, propellers or other systems or components such that 16V 2000M91 engines and vessel successfully pass a sea trial; the costs of the engineering analysis and modifications necessary to install the 16V 2000M91 engines in Plaintiffs' vessel with the ZF 2555 gears; and all equipment, work and cosmetic repairs necessary to complete the installation in accordance with good marine practice.

The Court has further determined based on the evidence, testimony and documents presented that the Court will exercise its equity powers to require the posting and placement of a performance bond by Detroit Diesel in an amount of $1,000,000.00 to ensure further compliance with the Memorandum of Settlement and a date certain to

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com

complete the work.  While there is no provision in the Memorandum of Settlement for Detroit Diesel to post a performance bond, the Court finds as a matter of law and equity that this action is necessary to ensure that in the future Detroit Diesel will be diligent in complying with the requirements of the Memorandum of Settlement.

**(3) (c) Compensatory and nominal damages that are a direct and proximate cause of the breach.**

Plaintiffs are entitled to following additional damages:

1. The costs of dockage and crew costs from October 1, 2006 when the work should have been completed until the engine installation and a successful sea trial is completed calculated at $2, 355 per quarter for dockage and $1,000 per week for the crew;

2. Diminution of market value of the vessel as a result of the delay in carrying out the engine replacement from October 1, 2006 when the work should have been completed until the engine installation and a successful sea trial is completed calculated at $22,500 per month;

3. Interest on the late payment of attorneys fees and costs calculated at 7.5% from March 24, 2006 until August 3, 2006;

4. Sanctions in the amount of $100,000 to be paid by Detroit Diesel.

The Court further finds that Plaintiffs did not breach the Memorandum of Settlement and acted reasonably in not tendering the vessel to Cable Marine on October 18-23, 2006 due to the breach and anticipatory breach of the Memorandum of Settlement by Defendant.

Houck Anderson, attorneys at law
200 South Biscayne Boulevard, Suite 300, Miami, Florida 33131-2332
Tel (305) 372-9044   Fax (305) 372-5044   www.houckanderson.com

Respectfully submitted,

s/Matthew J. Valcourt
Matthew J. Valcourt, Esq.
Florida Bar No. 0088791
Andrew W. Anderson, Esq.
Florida Bar No.: 213144
HOUCK ANDERSON P.A.
Attorneys for Plaintiffs
200 South Biscayne Blvd., Suite 300
Miami, Florida 33131-2332
Telephone 305-372-9044
Telefax 305-372-5044
Email: aanderson@houckanderson.com
            mvalcourt@houckanderson.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by email and through electronic filing on this 23rd day of February 2007 to this honorable Court and to Scott Sarason, Esquire and Christina McGinley-Paul, Esquire, Rumberger, Kirk & Caldwell, Brickell Bayview Centre, Suite 3000, 80 Southwest 8th Street, Miami, Florida 33130-3047 attorneys for Detroit Diesel.

        s/Matthew J. Valcourt
Matthew J. Valcourt, Esquire

HOUCK ANDERSON, ATTORNEYS AT LAW
200 SOUTH BISCAYNE BOULEVARD, SUITE 300, MIAMI, FLORIDA 33131-2332
TEL (305) 372-9044   FAX (305) 372-5044   www.houckanderson.com